MERIBEAR PRODUCTIONS, INC. *v.*
JOAN E. FRANK ET AL.
(SC 20473)

Robinson, C. J., and McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiff, M Co., which had obtained a judgment in California against
the defendants, J and G, sought to enforce that judgment in Connecticut
and to recover damages in connection with a home staging services and
lease agreement between the parties. Pursuant to the agreement, M Co.,
a California corporation, was to provide design and decorating services,
including the delivery and installation of rental furniture and décor, for
the purpose of making the defendants' Connecticut residence more
attractive to potential buyers. J was the sole signatory to the agreement,

Meribear Productions, Inc. *v.* Frank

but M Co. negotiated the agreement exclusively with G. The lease required an initial payment and had an initial term of four months. If the residence was not sold within that term, the lease would continue on a month-to-month basis at a monthly rate. One provision of the agreement contained both a choice of law clause, providing that California law governed the agreement, and a forum selection clause, which vested courts in Los Angeles, California, with jurisdiction over disputes arising under the agreement and provided that the parties consented to the jurisdiction of that court. Beneath that provision, G amended the choice of law clause, writing in that, "[s]ince this is a contract for an agreement taking place in the state of Connecticut, Connecticut laws will [supersede] those of California." Additionally, although G did not sign the agreement, he signed an addendum to the agreement authorizing M Co. to charge his credit card for the initial payment. G made the initial payment to M Co., which then delivered and installed the rental furniture and décor. Thereafter, the defendants defaulted on their payment obligations. The defendants denied M Co. access to the premises when it attempted to repossess its furniture and décor, which ultimately remained in the residence for approximately three years. M Co. filed an action in California Superior Court, which rendered a default judgment against the defendants after they failed to appear. When the default judgment remained unsatisfied, M Co. filed the present action, seeking enforcement of the California judgment and alleging breach of contract and quantum meruit. As to the claim seeking enforcement of the California judgment, the trial court concluded that the California court lacked personal jurisdiction over J, but not over G, and that the California court's judgment was entitled to full faith and credit as to G. As to the breach of contract claim, the court found that J had breached the home staging services agreement. In doing so, it rejected J's special defense that the agreement was unenforceable because it failed to comply with certain provisions of the Home Solicitation Sales Act (§ 42-134a et seq.) (HSSA). The court specifically determined that a home staging agreement, which involves the use of goods and services to facilitate the sale or rental or real property, was excluded from the purview of the HSSA, which exempts transactions "pertaining to the sale or rental of real property" from its requirements. Accordingly, the trial court rendered judgment for M Co. and against G in connection with the enforcement of the California judgment and awarded M Co. the full amount of that judgment. In connection with the breach of contract claim, the court rendered judgment for M Co. and against J, and awarded M Co. damages for the conversion of M Co.'s furniture and décor, as well as for the associated rental loss of that inventory. Having done so, the court declined to address M Co.'s quantum meruit claim as to J. Thereafter, M Co. withdrew the breach of contract and quantum meruit claims as to G, and the defendants appealed. *Held*:

340 Conn. 711 JANUARY, 2022 713

Meribear Productions, Inc. *v.* Frank

1. The trial court correctly concluded that the California court had personal jurisdiction over G, G having consented to jurisdiction in California by virtue of the agreement's forum selection clause, and, accordingly, the trial court properly found that the California judgment was enforceable against G: although a nonsignatory to a contract generally is not bound by a forum selection clause contained therein, under the "closely related" doctrine, a nonsignatory may be bound by that clause if he was so intimately involved in the negotiation, formation, execution, or ratification of the contract that it was reasonably foreseeable that he would be bound by it, considering factors such as the nonsignatory's relationship to the signatory and whether the nonsignatory received a direct benefit from the agreement; in the present case, the defendants did not dispute that the forum selection clause in the agreement was valid and enforceable, and G was so closely related to the agreement that he was bound by its forum selection clause, especially when G was married to J and lived in the residence she owned, in which they wrongfully used M Co.'s inventory for three years; moreover, in addition to receiving a direct benefit under the agreement, only G, and not J, participated in the negotiations, he made a substantive change to the agreement prior to its execution, notably amending the choice of law clause while leaving the forum selection clause in that same provision untouched, and he executed an addendum to the agreement, pursuant to which he authorized the sole payment made to M Co. that prompted M Co.'s full performance of its contractual obligations.

2. The defendants could not prevail on their claim that the home staging services agreement was unenforceable due to M Co.'s noncompliance with certain provisions of the HSSA, as the trial court correctly concluded that the transaction between the parties was not a "home solicitation sale," as defined therein, and, therefore, was outside the purview of the HSSA: the provisions of the HSSA apply only to "home solicitation sale[s]," the statutory (§ 42-134a (a) (5)) definition of which excludes any transaction "pertaining to the sale or rental of real property"; moreover, although a narrow construction of that language that applied only to contracts for the sale or rental of real property was inconsistent with the dictionary definitions of the phrase "pertaining to," this court nonetheless concluded that it would yield absurd results to construe the real property exception as applying to all transactions for goods and services that relate to, or are an adjunct or accessory to, the sale or rental of real property; accordingly, this court turned to extratextual sources, including legislative history, the federal regulations on which the real property exception was based, and sister state precedent, and, consistent with the liberal construction afforded to remedial statutes such as the HSSA, concluded that a "home solicitation sale" is not strictly limited to the sale or rental of real property but, instead, includes a limited category of consumer goods and services that may be excluded under the real property exception; in the present case, the sale of the residence

Meribear Productions, Inc. *v.* Frank

was the stated purpose of the agreement, the duration of the agreement was defined by how long it took for the property to sell, and the sale of the property delimited the agreement's various terms by, for example, allowing M Co. to remove the furniture and décor if the defendants' residence was not listed for sale within a prescribed period of time, such that the terms of the agreement were so intertwined with the sale of the defendants' property that the agreement was inextricably related to, or an integral adjunct or accessory to, the sale of the home.

3. There was no merit to the defendants' claim that the award of damages was improper insofar as the trial court awarded M Co. double damages by rendering judgment against both G and J for the same loss and included the conversion value of the furniture and décor in the amount of damages for which J was liable in connection with the breach of contract claim; although a party may recover just damages for the same loss only once, it was undisputed that M Co.'s loss was wholly unsatisfied when the trial court rendered judgment in its favor on the claim against G concerning the enforceability of the California judgment and on the breach of contract claim against J, and the trial court was not foreclosed from rendering judgment in favor of M Co. against both defendants, jointly or separately, for injuries for which each is liable; moreover, the trial court's award of damages for the conversion value of the furniture and décor was not clearly erroneous in light of the fact that J caused M Co.'s total loss of that inventory by keeping and using it in her personal residence for three years, as M Co.'s loss of the furniture and décor was a reasonably foreseeable consequence of J's breach of the home staging services agreement.

(*Two justices concurring in part and dissenting in part in one opinion*)

Argued September 8, 2020—officially released September 22, 2021*

*Procedural History*

Action to enforce a foreign default judgment rendered against the defendants in California, and for other relief, brought to the Superior Court in the judicial district of Fairfield and tried to the court, *Tyma, J.*; judgment for the plaintiff, from which the defendants appealed to the Appellate Court, *Gruendel*, *Alvord* and *Pellegrino*, *Js.*, which affirmed the trial court's judgment, and the defendants, on the granting of certification, appealed to this court, which reversed the judgment of the Appellate Court and remanded the case to that court with direc-

* September 22, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

Meribear Productions, Inc. *v.* Frank

tion to dismiss the defendants' appeal; thereafter, the plaintiff withdrew the remaining counts of the complaint, and the defendants appealed. *Affirmed.*

*Michael S. Taylor*, with whom was *Brendon P. Levesque*, *for the appellants (defendants).*

*Anthony J. LaBella*, with whom, on the brief, was *Deborah M. Garskof*, for the appellee (plaintiff).

*Opinion*

ECKER, J. This appeal arises out of a dispute between the plaintiff, Meribear Productions, Inc., doing business as Meridith Baer and Associates, and the defendants, Joan E. Frank and George A. Frank, in connection with a contract for the design, decoration, and staging for sale of the defendants' residence at 3 Cooper Lane in Westport. After the plaintiff staged the defendants' home by installing rental furniture, antiques, art, and home décor for the purpose of enhancing its appearance and, thereby, its prospects for sale, the defendants defaulted on their contractual payment obligations to the plaintiff. The plaintiff, a California company, obtained a default judgment against the defendants in its home state and thereafter filed an action in the Superior Court in Connecticut seeking to enforce the California judgment or, alternatively, to recover under the theories of breach of contract or quantum meruit. The trial court rendered judgment in favor of the plaintiff against George Frank on the count seeking to enforce the California judgment and in favor of the plaintiff against Joan Frank on the breach of contract count.[1] On appeal, the defendants claim that (1) the California judgment is unenforceable for lack of personal jurisdiction, (2) the contract is unenforceable

---

[1] The trial court determined that there was no need to adjudicate the quantum meruit claim against Joan Frank after finding her liable for breach of contract. The plaintiff subsequently withdrew the breach of contract and quantum meruit claims against George Frank.

Meribear Productions, Inc. *v.* Frank

under the Home Solicitation Sales Act (HSSA), General Statutes § 42-134a et seq., and (3) the amount of damages awarded by the trial court was improper. We affirm the judgment of the trial court.

The relevant facts either are undisputed or were found by the trial court following a bench trial. The plaintiff is a California corporation that provides residential design and decoration services, including the delivery, staging and leasing of home furnishings and décor. The defendants are a married couple who resided in a home owned by Joan Frank at 3 Cooper Lane in Westport. In an effort to sell their home and make it more attractive to potential purchasers, Joan Frank, as the homeowner, entered into a "[s]taging [s]ervices and []l]ease [a]greement" (agreement) with the plaintiff on March 13, 2011. Under the terms of the agreement, Joan Frank agreed to pay the plaintiff a " '[s]taging [f]ee' " in the amount of $19,000, which represented a nonrefundable " '[i]nitial [p]ayment' " due "prior to [the] delivery and installation" of the furnishings. After the delivery and installation of the furnishings, the agreement provided that Joan Frank would make monthly rental payments in the amount of $1900 beginning on July 23, 2011. The initial term of the agreement was for four months "or until the buyer's contingencies are either satisfied or waived with respect to the purchase of the [p]roperty, whichever comes first." If the property did not sell after four months, then the agreement would continue on a monthly basis, subject to the right of either party to terminate the agreement by providing written notice.

Joan Frank was the sole signatory to the agreement. Although George Frank did not sign the agreement and was not a party to it, he participated in its negotiation. Indeed, in negotiating the agreement, the plaintiff dealt exclusively with George Frank, his office assistant, and the defendants' realtor. The plaintiff had no meaningful

Meribear Productions, Inc. *v.* Frank

dealings with Joan Frank other than her execution of the agreement.

In addition to negotiating the agreement, George Frank signed an addendum to the agreement, addendum B, which is a credit card authorization expressly made "a part of [the] [a]greement . . . ." Pursuant to the credit card authorization, George Frank "authorized the plaintiff to charge his Visa credit card a 'total amount' of $19,000." George Frank crossed out language in the addendum providing that he agreed to personally guarantee "any obligations that may become due."[2]

Although George Frank was not a party to the agreement, he made substantive modifications to its terms. Paragraph 19 of the agreement contains a choice of law provision, which provides that "[t]his [a]greement and the rights of the parties hereunder shall be determined, governed by and construed in accordance with the internal laws of the [s]tate of California without regard to conflicts of laws principles." Paragraph 19 also contains a forum selection clause, which provides that "[a]ny dispute under that [a]greement shall only be litigated in any court having its situs within the [c]ity of Los Angeles, California, and the parties consent and submit

___

[2] Addendum B is a preprinted form that, in its original format, provided in relevant part: "I authorize [the plaintiff] to charge my credit card for any due amount resulting from this staging/design agreement. I agree by signing below to personally guarantee to [the plaintiff], any obligations that may become due.

"Upon acceptance of this application, the client agrees to the payment terms stated by the creditor, [the plaintiff]. A 10 [percent] finance charge will apply on any open balances beyond terms. I understand that I am fully responsible for all balances on my account, and I am liable for additional charges that may be incurred by [the plaintiff] as a result of collection and/ or legal proceedings. . . ."

George Frank crossed out the term "any" in the first sentence and inserted the sum of "19,000" in its place. George Frank also crossed out the phrase, "any obligations that may become due," in the second sentence. Finally, the last sentence of the second paragraph is crossed out entirely.

to the jurisdiction of any court located within such venue.'' Despite the choice of law provision, George Frank unilaterally added the following language at the end of paragraph 19: "Since this is a contract for an agreement taking place in the state of Connecticut, Connecticut laws will [supersede] those of California." (Emphasis omitted.)

After George Frank made the initial payment of $19,000, the plaintiff delivered and installed the rental furnishings and décor pursuant to the terms of the agreement. Thereafter, the defendants defaulted on their rental obligation. The plaintiff hired a crew of movers to remove the rental furnishings and décor from the defendants' residence, but the defendants denied the movers access to the premises. The defendants demanded that the plaintiff provide a written release of all claims, but the plaintiff refused. The inventory remained in the home.[3]

The litigation began in California. On February 15, 2012, the plaintiff filed suit against the defendants in the Superior Court of California, county of Los Angeles, claiming, inter alia, breach of contract and conversion. That action resulted in a default judgment against the defendants in the amount of $259,746.10. When the default judgment remained unsatisfied, the plaintiff brought an action against the defendants in the Superior Court for the judicial district of Fairfield, seeking to enforce the foreign judgment. Alternatively, the plaintiff sought recovery against the defendants for breach of contract and quantum meruit under counts two and three of the complaint, respectively. The defendants

---

[3] Sometime during the pendency of the present appeal, the defendants sold their residence at 3 Cooper Lane. See *Meribear Productions, Inc.* v. *Frank*, 165 Conn. App. 305, 309, 140 A.3d 993 (2016), rev'd, 328 Conn. 709, 183 A.3d 1164 (2018). The plaintiff's counsel stated at oral argument before the Appellate Court that the current whereabouts of the home furnishings and décor are unknown. See id.

Meribear Productions, Inc. *v.* Frank

raised various special defenses. In particular, the defendants claimed that (1) the California judgment was unenforceable for lack of personal jurisdiction, (2) the agreement was unenforceable under the HSSA because the plaintiff failed to advise the defendants of their cancellation rights, and (3) the plaintiff failed to mitigate its damages and breached the covenant of good faith and fair dealing.

On count one of the plaintiff's complaint, seeking enforcement of the California judgment, the trial court found that the California court lacked personal jurisdiction over Joan Frank due to insufficient service of process but that "the substituted service of process on George Frank [was] valid."[4] "To the extent that George Frank claim[ed] that the California court lacked sufficient minimum contacts over him" to satisfy the due process clause of the federal constitution, the trial court "disagree[d]." The trial court reasoned that "George Frank admit[ted] that he signed a guarantee of the staging agreement with a company that has a principal place of business in California and that [the agreement] provides that [the city of] Los Angeles is the appropriate forum. He disputes only the extent of the guarantee. The California court possessed personal jurisdiction

_____

[4] The plaintiff "attempted constructive service on the defendants" at the office of LCP Homes, Inc., "located at 1175 Post Road East in Westport." LCP Homes, Inc., "is a corporation owned by George Frank, and in which he and Joan Frank are corporate officers." The trial court determined that service of process on Joan Frank was insufficient under § 415.20 (b) of the California Code of Civil Procedure because "Joan Frank is not an owner or operator of the company, and, moreover, there is no evidence that she was ever present at the office." See Cal. Civ. Proc. Code § 415.20 (b) (Deering Supp. 2020) (providing that, in lieu of personal service, "a summons may be served by leaving a copy of the summons and complaint at the person's . . . usual place of business"). With respect to George Frank, the trial court found that substituted service of process was sufficient on the ground that "he is an owner of LCP Homes [Inc.] and Andy Frank Builders, which shared the [office at] 1175 Post Road East," and "he had a presence at the office at the time of service . . . ."

Meribear Productions, Inc. *v.* Frank

over George Frank, and its judgment is entitled to full faith and credit as to him.'' Therefore, the trial court rendered judgment ''in favor of the plaintiff and against George Frank on the first count of the complaint for common-law enforcement of a foreign judgment.''

The trial court proceeded to address counts two and three of the plaintiff's complaint against Joan Frank for breach of contract and quantum meruit, respectively. In connection with count two, the trial court found that ''the plaintiff's evidence relevant to the claimed breach [was] credible,'' that ''[t]he furnishings were delivered to, and installed in, the residence in March, 2011,'' and that ''Joan Frank failed to make the July rent payment, and the rent payments and other charges due there-after.'' Moreover, the trial court found that, following Joan Frank's default on the rental payments, the plaintiff attempted to remove the inventory from the defendants' residence, but the defendants wrongfully ''denied the movers access to their home unless the plaintiff provided them with a full release of all claims,'' which the plaintiff ''reasonably refused . . . .'' The trial court therefore concluded that Joan Frank had breached the agreement.

The trial court rejected Joan Frank's claim that the agreement was unenforceable under the HSSA because the plaintiff had not provided her with notice of her cancellation rights, concluding that the ''plain and unambiguous'' language of the statute exempts from the definition of a '' 'home solicitation sale' '' transactions '' 'pertaining to the sale or rental of real property.' '' Accord General Statutes § 42-134a (a) (5) (''[t]he term 'home solicitation sale' does not include a transaction . . . pertaining to the sale or rental of real property''). The trial court determined that ''[a]n agreement concerning the staging of a residential home for sale in the real estate marketplace'' pertains to the sale of real property and, therefore, is excluded from the purview

Meribear Productions, Inc. *v.* Frank

of the HSSA. The trial court also rejected Joan Frank's claim that the plaintiff had failed to mitigate its damages, finding that it was Joan Frank who had "wrongfully prevented" the removal of the home furnishings and décor. Furthermore, because "Joan Frank . . . wrongfully withheld payments under the agreement, and wrongfully refused the plaintiff's attempts to reclaim the inventory," the trial court found that she had breached the covenant of good faith and fair dealing by "injur[ing] the rights of the plaintiff to receive the benefits of the staging agreement." The trial court therefore rendered judgment in favor of the plaintiff and against Joan Frank on the plaintiff's breach of contract claim. Having determined that "[t]he plaintiff [proved] that Joan Frank breached the contract," the trial court stated that it "need not consider the alternative claim for quantum meruit."

Finally, the trial court addressed the issue of damages. On the first count of the complaint, enforcement of the California judgment against George Frank, the trial court awarded the plaintiff the full amount of the California judgment: $259,746.10. On the second count of the complaint, breach of contract against Joan Frank, the trial court awarded the plaintiff damages for the loss of the home furnishings and décor in the amount of $235,598 and an additional $47,508.45 for "the rental loss and related late fees," for a total of $283,106.45.

The defendants jointly appealed from the trial court's judgment to the Appellate Court, claiming that (1) the California judgment was unenforceable against George Frank for lack of personal jurisdiction, (2) the agreement was unenforceable because it did not provide the defendants with notice of their cancellation rights under the HSSA, and (3) the damages award was improper because (a) the trial court awarded double damages against George Frank and Joan Frank for the same loss, and (b) the trial court incorrectly included damages for

conversion of the home furnishings in the breach of contract award against Joan Frank. See *Meribear Productions, Inc.* v. *Frank*, 165 Conn. App. 305, 311, 316, 321–22, 140 A.3d 993 (2016), rev'd, 328 Conn. 709, 183 A.3d 1164 (2018). The Appellate Court affirmed the trial court's judgment, holding that (1) the California judgment was enforceable as to George Frank because he consented to personal jurisdiction in California by signing addendum B, which was incorporated into the agreement; see id., 315; (2) the agreement was not subject to the provisions of the HSSA because it fell within the statutory exemption for transactions pertaining to the sale or rental of real property under § 42-134a (a) (5); see id., 316, 321; and (3) the measure of damages was proper because (a) the plaintiff may recover the full amount of damages under either count one or count two of the complaint but may not recover twice for the same loss; see id., 322; and (b) the amount of damages on the breach of contract claim was not clearly erroneous in light of the trial court's factual findings "that Joan Frank had breached the staging services agreement by failing to pay the rent due, by wrongfully using the furniture in the defendants' personal residence for approximately three years, and by thwarting the plaintiff's efforts to retrieve its inventory, thereby resulting in the total loss of that inventory to the plaintiff." Id., 323.

This court granted the defendants' joint petition for certification to appeal.[5] See *Meribear Productions, Inc.* v. *Frank*, 322 Conn. 903, 138 A.3d 288 (2016). During the

---

[5] We granted the defendants' petition for certification to appeal, limited to the following issues: "Did the Appellate Court correctly determine that the trial court properly determined that: (1) the foreign judgment against [George Frank] was enforceable after concluding that he had minimum contacts with California that warranted the exercise of its jurisdiction; (2) the contract signed by [Joan Frank] was enforceable notwithstanding the provisions of the [HSSA]; and (3) an award of double damages to the plaintiff was appropriate." *Meribear Productions, Inc.* v. *Frank*, 322 Conn. 903, 138 A.3d 288 (2016).

Meribear Productions, Inc. *v.* Frank

adjudication of that appeal, a question arose "whether George Frank's appeal had been taken from a final judgment when the trial court's ruling had not disposed of all counts against him," namely, the plaintiff's alternative theories of recovery in counts two and three of the complaint, breach of contract and quantum meruit. *Meribear Productions, Inc.* v. *Frank*, 328 Conn. 709, 715, 183 A.3d 1164 (2018). Following oral argument and supplemental briefing from the parties, we determined that the trial court's judgment was not final given that counts two and three "remain[ed] unadjudicated" as to George Frank and "present[ed] the possibility that [he] could be found liable for additional damages." Id., 726. Accordingly, we reversed the judgment of the Appellate Court and remanded to that court with direction to dismiss the defendants' joint appeal. See id.

On remand to the trial court, the plaintiff withdrew counts two and three as to George Frank.[6] The defendants thereafter filed a joint appeal with the Appellate Court, which we transferred to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

I

The defendants first claim that the foreign judgment against George Frank is unenforceable for lack of personal jurisdiction because George Frank's sole contact with California was "sign[ing] a single credit authorization in Connecticut, and every relevant action the plaintiff took with regard to George Frank was taken in Connecticut. "The defendants contend that, under these circumstances, George Frank lacked sufficient mini-

[6] On remand, the plaintiff moved for an award of postjudgment interest pursuant to General Statutes § 37-3a (a) on the breach of contract claim against Joan Frank. The trial court concluded that the plaintiff was entitled to postjudgment interest in the amount of "5 percent per annum from the date of the final judgment until the date the judgment is paid" because Joan Frank had "deprived [the plaintiff] of the use of its money and furniture" since 2011.

Meribear Productions, Inc. *v.* Frank

mum contacts with California and that the assertion of personal jurisdiction over him in that state offended traditional notions of fair play and substantial justice in violation of the due process clause of the United States constitution. See, e.g., *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 478, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) ("an individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum" (emphasis in original)). The defendants further argue that George Frank did not consent to jurisdiction in California because he was not a party to the agreement, and, therefore, the forum selection clause in the agreement "cannot form a proper basis for jurisdiction."

The full faith and credit clause of the United States constitution governs an action to enforce a foreign judgment.[7] "[T]he full faith and credit clause requires a state court to accord to the judgment of another state the same credit, validity and effect as the state that rendered the judgment would give it. . . . This rule includes the proposition that lack of jurisdiction renders a foreign judgment void. . . . A party can therefore defend against the enforcement of a foreign judgment on the ground that the court that rendered the judgment lacked personal jurisdiction, unless the jurisdictional issue was fully litigated before the rendering court or the defending party waived the right to litigate the issue." (Citations omitted.) *Packer Plastics, Inc.* v. *Laundon*, 214 Conn. 52, 56, 570 A.2d 687 (1990). The party raising a jurisdictional claim as a defense against the enforcement of a foreign judgment bears the burden of proving, "by a preponderance of the evidence, facts that demonstrate that the foreign court lacked jurisdiction." *Maltas* v. *Maltas*, 298 Conn. 354, 364 n.11, 2 A.3d 902 (2010).

---

[7] The full faith and credit clause of the United States constitution provides in relevant part that "Full Faith and Credit shall be given in each State to the . . . judicial Proceedings of every other State. . . ." U.S. Const., art. IV, § 1.

Meribear Productions, Inc. *v.* Frank

On appeal, we defer to the trial court's factual findings but exercise plenary review over the ultimate question of personal jurisdiction. See *Ryan* v. *Cerullo*, 282 Conn. 109, 118, 918 A.2d 867 (2007). "The question of whether another state's court properly exercised personal jurisdiction is determined with reference to the law of that state." *Maltas* v. *Maltas*, supra, 298 Conn. 367; see, e.g., *Smith* v. *Smith*, 174 Conn. 434, 438–39, 389 A.2d 756 (1978); *J. Corda Construction, Inc.* v. *Zaleski Corp.*, 98 Conn. App. 518, 524, 911 A.2d 309 (2006).[8]

In California, "a civil court gains jurisdiction over a person through one of four methods. There is the old-fashioned method—residence or presence within the state's territorial boundaries. . . . There is minimum contacts—activities conducted or effects generated within the state's boundaries sufficient to establish a 'presence' in the state so that exercising jurisdiction is consistent with ' "traditional notions of fair play and substantial justice.' " . . . A court also acquires jurisdiction when a person participates in a lawsuit in the courthouse where it sits, either as the plaintiff initiating the suit . . . or as the defendant making a general appearance . . . . Finally, a party can consent to per-

[8] Of course, the due process clause sets the outer limits of a state court's exercise of personal jurisdiction. See, e.g., *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 923, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011) ("[t]he [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment sets the outer boundaries of a state tribunal's authority" to exercise personal jurisdiction over defendant); *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 291, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980) ("[a] judgment rendered in violation of due process is void in the rendering [s]tate and is not entitled to full faith and credit elsewhere"). Consistent with the requirements of the full faith and credit clause, however, we first must determine whether the exercise of jurisdiction comports with the applicable law of the foreign state. Under some circumstances—including the present case, as we shall see—we need go no further than an examination of state law because, if jurisdiction is established under state law, then the due process clause is satisfied.

Meribear Productions, Inc. *v.* Frank

sonal jurisdiction, when it would not otherwise be available.'' (Citations omitted; footnote omitted.) *Global Packaging, Inc.* v. *Superior Court*, 196 Cal. App. 4th 1623, 1629, 127 Cal. Rptr. 3d 813 (2011).

We need not address the defendants' minimum contacts argument because we conclude that George Frank consented to personal jurisdiction in California.[9] ''[D]ue process permits the exercise of personal jurisdiction over a nonresident defendant . . . when the defendant consents to jurisdiction. . . . A party, even one who has no minimum contacts with [a] state, may consent to jurisdiction in a particular case. . . . Agreeing to resolve a particular dispute in a specific jurisdiction, for example, is one means of expressing consent to [the] personal jurisdiction of courts in the forum state for purposes of that dispute. . . . [Although] subject matter jurisdiction cannot be conferred by consent, personal jurisdiction can be so conferred, and consent may be given by a contract provision.'' (Citation omitted; internal quotation marks omitted.) *Rockefeller Technology Investments (Asia) VII* v. *Changzhou SinoType Techonology Co., Ltd.*, 9 Cal. 5th 125, 140, 460 P.3d 764, 260 Cal. Rptr. 3d 442, cert. denied, U.S. , 141 S. Ct. 374, 208 L. Ed. 2d 98 (2020); see also *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 472 n.14 (''[B]ecause the personal jurisdiction requirement is a waivable

―――――――――――――――

[9] The concurring and dissenting opinion presumes that, by resting our jurisdictional holding on the closely related doctrine, we implicitly have concluded that George Frank lacks minimum contacts with California. That presumption is incorrect. The plaintiff's primary argument throughout this litigation has been that George Frank consented to personal jurisdiction in California. The closely related doctrine on which we base our holding falls within ''one of four traditional bases for the exercise of personal jurisdiction over a nonresident defendant'' in California, namely, consent, which is ''separate from the 'minimum contacts' analysis.'' *Nobel Farms, Inc.* v. *Pasero*, 106 Cal. App. 4th 654, 658, 130 Cal. Rptr. 2d 881 (2003). Because consent is an alternative basis for personal jurisdiction, we need not conduct a minimum contacts analysis, and we express no opinion on the merits of the parties' minimum contacts arguments.

Meribear Productions, Inc. *v.* Frank

right, there are a variety of legal arrangements by which a litigant may give express or implied consent to the personal jurisdiction of the court. . . . For example, particularly in the commercial context, parties frequently stipulate in advance to submit their controversies for resolution within a particular jurisdiction. . . . [When] such [forum selection] provisions have been obtained through freely negotiated agreements and are not unreasonable and unjust . . . their enforcement does not offend due process.'' (Citations omitted; internal quotation marks omitted.)).

In the present case, the agreement expressly provided in relevant part that ''[a]ny dispute under [the] agreement shall *only* be litigated in any court having its situs within the [c]ity of Los Angeles, California, and *the parties consent and submit to the jurisdiction of any court located within such venue.*'' (Emphasis added.) The defendants do not dispute that the forum selection clause in the agreement is valid and enforceable[10] and, therefore, that its ''enforcement does not offend due process.'' *Burger King Corp.* v. *Rudzewicz*, supra, 471 U.S. 472 n.14. Instead, they contend that George Frank is not bound by the forum selection clause because he did not sign the agreement. We disagree.

Generally, a nonsignatory to a contract is not bound by a forum selection clause contained therein. See, e.g., *Berclain America Latina S.A.*, *de C.V.* v. *Baan Co. N.V.*, 74 Cal. App. 4th 401, 404–405, 409, 87 Cal. Rptr. 2d 745 (1999) (holding that nonsignatory to contract lacked standing to enforce forum selection clause). An exception to this general rule exists, however, for nonsignatories who are ''so closely involved in the agreement or associated with a party to the transaction as

_____

[10] To the extent the defendants contend that the forum selection clause is unenforceable under the HSSA because the plaintiff failed to provide them with notice of their cancellation rights as required by § 42-135a (2), we reject this claim for the reasons explained in part II of this opinion.

Meribear Productions, Inc. *v.* Frank

to be functionally equivalent to that party.'' Id., 403; see *Net2Phone, Inc.* v. *Superior Court*, 109 Cal. App. 4th 583, 589, 135 Cal. Rptr. 2d 149 (holding that forum selection clause was enforceable against nonsignatory on ground that it was '' 'closely related' to the contractual relationship because it stands in the shoes of those whom it purports to represent''), review denied, Docket No. S117411 (Cal. August 27, 2003); *Bancomer, S. A.* v. *Superior Court*, 44 Cal. App. 4th 1450, 1461, 52 Cal. Rptr. 435 (1996) (to demonstrate that nonsignatory is '' 'so closely related to the contractual relationship' that it is entitled to enforce the forum selection clause, it must show by specific conduct or express agreement that (1) it agreed to be bound by the terms of the . . . agreement, (2) the contracting parties intended the [nonsignatory] to benefit from the . . . agreement, or (3) there was sufficient evidence of a defined and intertwining business relationship with a contracting party''); *Lu* v. *Dryclean-U.S.A. of California, Inc.*, 11 Cal. App. 4th 1490, 1494, 14 Cal. Rptr. 2d 906 (1992) (holding that nonsignatories were bound by forum selection clause because they were ''closely related to the contractual relationship'' in that they allegedly ''participated in the fraudulent representations [that] induced [the] plaintiffs to enter into the [a]greement'').

Under the ''closely related'' doctrine, a nonsignatory to a contract may be bound by a forum selection clause if the nonsignatory was so intimately involved in the negotiation, formation, execution, or ratification of the contract that it was reasonably foreseeable that he or she would be bound by the forum selection clause. See, e.g., *Carlyle Investment Management, LLC* v. *Moonmouth Co. SA*, 779 F.3d 214, 219 (3d Cir. 2015) (''even if [the] defendants are not parties to the agreement or third-party beneficiaries of it, they may be bound by the forum selection clause if they are closely related to the agreement in such a way that it would be foreseeable

Meribear Productions, Inc. *v.* Frank

that they would be bound''); *Lipcon* v. *Underwriters at Lloyd's, London,* 148 F.3d 1285, 1299 (11th Cir. 1998) (nonsignatories who signed letters of credit to provide collateral for signatories were bound by forum selection clause because their ''interests . . . in [the] dispute are completely derivative of those of [the signatories]—and thus 'directly related to, if not predicated upon' the interests of the [signatories]''), cert. denied, 525 U.S. 1093, 119 S. Ct. 851, 142 L. Ed. 2d 704 (1999); *Hugel* v. *Corp. of Lloyd's,* 999 F.2d 206, 209 (7th Cir. 1993) (''[i]n order to bind a [nonparty] to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound''); *Manetti-Farrow, Inc.* v. *Gucci America, Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988) (nonsignatories were bound by forum selection clause because they were ''so closely related to the contractual relationship''). In determining whether a nonsignatory may be bound by a forum selection clause, ''courts consider the [nonsignatory's] . . . relationship [to the signatory] and whether the [nonsignatory] received a direct benefit from the agreement.''[11] *Carlyle Investment Management, LLC* v. *Moonmouth Co. SA*, supra, 219.

Applying these factors, we conclude that George Frank was so closely related to the agreement that he is bound by the forum selection clause explicitly providing that the ''the parties consent and submit to the jurisdiction of any court located within'' the city of Los Angeles, California. First, the record reflects that George Frank participated in the negotiation of the agreement prior to its execution. Indeed, even though Joan Frank was ''the sole signatory [to] the agreement,'' she had no ''meaningful dealings concerning the matter'' and ''was not involved in the process other than signing

---

[11] In the context of parent-subsidiary corporate relationships, courts also consider ''the [nonsignatory's] ownership of the signatory . . . .'' *Carlyle Investment Management, LLC* v. *Moonmouth Co. SA*, supra, 779 F.3d 219.

the agreement.'' Instead, George Frank negotiated the agreement, ''took charge of the project and dealt with the plaintiff.'' George Frank was a party to the agreement in all but name.

Second, George Frank made substantive changes to the agreement prior to its execution. Specifically, ''George Frank unilaterally added the following language to the end of paragraph 19,'' which is the portion of the agreement that contains the forum selection clause and the choice of law provision: ''Since this is a contract for an agreement taking place in the state of Connecticut, Connecticut laws will [supersede] those of California.'' Notably, George Frank made no amendments to the forum selection clause.

Third, in addition to negotiating and amending the agreement, George Frank executed addendum B, which is a credit card authorization that expressly was made ''a part of [the] [a]greement . . . .'' Pursuant to addendum B, George Frank authorized a onetime credit card payment in the amount of $19,000, which represented the ''[i]nitial [p]ayment'' or ''[s]taging [f]ee'' due under the agreement. By doing so, George Frank authorized the sole payment made to the plaintiff and prompted the plaintiff's full performance of its contractual obligations under the terms of the agreement.

Lastly, we consider George Frank's relationship with the parties and whether he benefited from the agreement. As we previously explained, George Frank is married to Joan Frank and resided with her at 3 Cooper Lane—where the home furnishings and décor were installed and remained for years. See footnote 3 of this opinion. Given that George Frank plainly enjoyed the use and benefit of the home furnishings and décor and shared his wife's desire to enter into the agreement for the purpose of selling their marital residence, we have

Meribear Productions, Inc. *v.* Frank

no trouble concluding that he received a direct benefit under the agreement.

For the foregoing reasons, we conclude that George Frank consented to personal jurisdiction in California. Accordingly, the trial court properly found that the California judgment is enforceable against George Frank under the full faith and credit clause.

The concurring and dissenting opinion objects to our reliance on the closely related doctrine to affirm the trial court's enforcement of the foreign judgment against George Frank, arguing that "the plaintiff did not advance [this theory], either in the trial court or before this court," and that the plaintiff did not raise it as an alternative ground for affirmance under Practice Book § 63-4 (a). It is true that the plaintiff did not frame its jurisdictional argument using the line of cases discussed in this opinion. In all but name, however, the gravamen of the plaintiff's argument throughout this litigation has been that George Frank was so closely related to the transaction that he should be bound by the forum selection clause in the agreement signed by his wife, Joan Frank. The record reveals that the plaintiff consistently has maintained that George Frank consented to personal jurisdiction in California via the forum selection clause, even though he was not a signatory to the agreement.[12] In support of this argument, the plaintiff always has emphasized George Frank's close involvement in the negotiation and execution of the agreement, pointing

_____

[12] Indeed, the plaintiff's primary argument on appeal is that "George Frank expressly consented to the jurisdiction of the California courts by knowingly signing a contract that contained a forum selection clause, thereby making the California judgment fully enforceable against him in [Connecticut]." Although the concurring and dissenting opinion correctly observes that "George Frank has consistently argued that he lacked sufficient minimum contacts with California," the plaintiff also consistently has argued that George Frank consented to personal jurisdiction in California by virtue of his involvement in the negotiation and execution of the agreement and addendum B.

Meribear Productions, Inc. *v.* Frank

out that he signed addendum B and "made specific, handwritten changes to the [agreement] in certain places, including to the forum selection clause, which . . . expressly included the selection of California for litigation arising under the [agreement], yet did not alter or delete his consent to California jurisdiction."[13] (Emphasis omitted.)

The plaintiff's failure to cite the applicable, governing case law is not fatal to its claim because it is well established that "[w]e may . . . review legal arguments that differ from those raised" by the parties "if they are subsumed within or intertwined with arguments related to the legal claim before the court."[14] (Internal quotation marks omitted.) *Jobe* v. *Commissioner of Correction*, 334 Conn. 636, 644 n.2, 224 A.3d 147 (2020); see *State* v. *Santiago*, 318 Conn. 1, 124, 122 A.3d 1 (2015) ("[W]e generally do not consider *claims or issues* that the parties themselves have not raised

---

[13] Although the plaintiff did not file notice of its intention to raise George Frank's consent to jurisdiction in California as an alternative ground on which to affirm the judgment of the trial court pursuant to Practice Book § 63-4 (a) (1), this procedural irregularity does not preclude our review of the plaintiff's claim. See, e.g., *Gerardi* v. *Bridgeport*, 294 Conn. 461, 466, 985 A.2d 328 (2010) (reviewing alternative ground for affirmance, even though defendants did not file notice under § 63-4 (a) (1), because there was no prejudice to the plaintiffs given that "the defendants . . . raised the claim in their briefs . . . and the plaintiffs had an adequate opportunity to respond, and did so, in their reply briefs").

[14] The concurring and dissenting opinion is concerned that "we might be going beyond the confines of our adversarial system in our discovery of an additional doctrine that supports the plaintiff . . . ." As a general admonition, the concern is valid. The issue arises because we will occasionally rest our decision on a legal doctrine or theory that is not identical to the one argued and briefed by the parties. We agree with the concurring and dissenting opinion that, ordinarily, we must desist from deciding cases on grounds that the parties have not raised. In our view, however, the distinction in our case law between *claims* and *arguments*, as outlined in the text accompanying this footnote, accurately and adequately delineates the "limits of th[e] latitude" that govern our appellate review. For the reasons set forth herein, we are confident that we have not exceeded those limits under the circumstances of this case.

Meribear Productions, Inc. *v.* Frank

. . . [but] in cases too numerous to mention, we have considered *arguments or factors* pertaining to those claims or issues that were not expressly identified by the parties." (Citation omitted; emphasis in original.)). This is because, "when [a case] is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law . . . ." (Internal quotation marks omitted.) *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 148, 84 A.3d 840 (2014); see *In re David B.*, 167 Conn. App. 428, 448 n.10, 142 A.3d 1277 (2016) ("[i]n resolving a claim raised by the parties, we are not required to constrain our analysis to the law relied on by the parties"). Our independent power to identify and apply the proper construction of the governing law is particularly important in a case such as the present one, given our constitutional obligation to afford full faith and credit to the California judgment. See, e.g., *State* v. *Santiago*, supra, 124 (emphasizing importance of our power to identify and apply proper construction of governing law "when plenary consideration is necessary to thoroughly address and accurately decide constitutional claims and other matters of substantial public importance"). In light of the clear applicability of the closely related doctrine to the facts marshaled by the parties and found by the trial court,[15] we affirm the trial court's judgment enforcing the California judgment against George Frank.

II

The defendants next claim that the agreement is unenforceable under the HSSA because it did not include a notice of their cancellation rights in accor-

[15] We do not share the concern of the concurring and dissenting opinion regarding the factual findings of the trial court. The trial court expressly found that both of the defendants resided at 3 Cooper Lane and "have been wrongfully using the furniture in their personal residence for . . . years."

734 JANUARY, 2022 340 Conn. 711

Meribear Productions, Inc. *v.* Frank

dance with General Statutes § 42-135a (2).[16] The plaintiff

There is no question that George Frank received a direct benefit under the agreement.

[16] General Statutes § 42-135a provides: "No agreement in a home solicitation sale shall be effective against the buyer if it is not signed and dated by the buyer or if the seller shall:

"(1) Fail to furnish the buyer with a fully completed receipt or copy of all contracts and documents pertaining to such sale at the time of its execution, which contract shall be in the same language as that principally used in the oral sales presentation and which shall show the date of the transaction and shall contain the name and address of the seller, and in immediate proximity to the space reserved in the contract for the signature of the buyer, or on the front page of the receipt if a contract is not used, and in boldface type of a minimum size of ten points, a statement in substantially the following form:

"YOU, THE BUYER, MAY CANCEL THIS TRANSACTION AT ANY TIME PRIOR TO MIDNIGHT OF THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.

"(2) Fail to furnish each buyer, at the time such buyer signs the home solicitation sales contract or otherwise agrees to buy consumer goods or services from the seller, a completed form in duplicate, captioned 'NOTICE OF CANCELLATION', which shall be attached to the contract or receipt and easily detachable, and which shall contain in ten-point boldface type the following information and statements in the same language as that used in the contract:

"NOTICE OF CANCELLATION

". . . . (Date of Transaction)
"YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN THREE BUSINESS DAYS FROM THE ABOVE DATE.

"IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN TEN BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

"IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MAY, IF YOU WISH, COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.

"IF YOU DO MAKE THE GOODS AVAILABLE TO THE SELLER AND THE SELLER DOES NOT PICK THEM UP WITHIN TWENTY DAYS OF THE DATE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION. IF YOU FAIL TO MAKE

340 Conn. 711          JANUARY, 2022          735

Meribear Productions, Inc. *v.* Frank

responds that it was not required to provide a notice
of cancellation rights because the agreement falls out-
side the purview of the HSSA. Specifically, the plaintiff
contends that the transaction at issue was not a "home
solicitation sale," as defined by the HSSA, because it

---

THE GOODS AVAILABLE TO THE SELLER, OR IF YOU AGREE TO
RETURN THE GOODS TO THE SELLER AND FAIL TO DO SO, THEN YOU
REMAIN LIABLE FOR PERFORMANCE OF ALL OBLIGATIONS UNDER
THE CONTRACT.

"TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND
DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRIT-
TEN NOTICE, OR SEND A TELEGRAM TO . . . . (Name of Seller) AT
. . . . (Address of Seller's Place of Business) NOT LATER THAN MIDNIGHT
OF . . . . (Date)

"I HEREBY CANCEL THIS TRANSACTION.

". . . . (Date)

". . . . (Buyer's Signature)

"(3) Fail, before furnishing copies of the 'Notice of Cancellation' to the
buyer, to complete both copies by entering the name of the seller, the
address of the seller's place of business, the date of the transaction, and
the date, not earlier than the third business day following the date of the
transaction, by which the buyer may give notice of cancellation.

"(4) Include in any home solicitation sale contract or receipt any confes-
sion of judgment or any waiver of any of the rights to which the buyer is
entitled under this chapter, including specifically such buyer's right to cancel
the sale in accordance with the provisions of this section.

"(5) Fail to inform each buyer, orally, at the time such buyer signs the
contract or purchases the goods or services, of such buyer's right to cancel.

"(6) Misrepresent in any manner the buyer's right to cancel.

"(7) Fail or refuse to honor any valid notice of cancellation by a buyer
and within ten business days after the receipt of such notice, to (A) refund
all payments made under the contract or sale; (B) return any goods or
property traded in, in substantially as good condition as when received by
the seller; (C) cancel and return any negotiable instrument executed by the
buyer in connection with the contract or sale and take any action necessary
or appropriate to terminate promptly any security interest created in the
transaction; and (D) cancel and return any contract executed by the buyer
in connection with the transaction.

"(8) Negotiate, transfer, sell, or assign any note or other evidence of
indebtedness to a finance company or other third party prior to midnight
of the fifth business day following the date the contract was signed or the
goods or services purchased.

"(9) Fail, within ten business days of receipt of the buyer's notice of
cancellation, to notify such buyer whether the seller intends to repossess
or to abandon any shipped or delivered goods."

736 JANUARY, 2022 340 Conn. 711

Meribear Productions, Inc. *v.* Frank

"pertain[ed] to the sale or rental of real property" under
§ 42-134a (a) (5).[17]

The scope and meaning of the phrase "home solicita-
tion sale" in the HSSA presents a question of statutory
construction, over which we exercise plenary review.
See, e.g., *Cambodian Buddhist Society of Connecticut,
Inc.* v. *Planning & Zoning Commission*, 285 Conn. 381,
422, 941 A.2d 868 (2008). "When construing a statute,
[o]ur fundamental objective is to ascertain and give
effect to the apparent intent of the legislature." (Internal
quotation marks omitted.) *Ugrin* v. *Cheshire*, 307 Conn.
364, 379, 54 A.3d 532 (2012). General Statutes § 1-2z
guides this analysis and "directs us first to consider the
text of the statute itself and its relationship to other
statutes." (Internal quotation marks omitted.) Id.

Section 42-135a provides in relevant part that "[n]o
agreement in a home solicitation sale shall be effective
against the buyer" if the seller "[f]ail[s] to furnish each
buyer, at the time such buyer signs the home solicitation
sales contract or otherwise agrees to buy consumer
goods or services from the seller, a completed form
in duplicate, captioned 'NOTICE OF CANCELLATION',
which shall be attached to the contract or receipt and
easily detachable, and which shall contain in ten-point
boldface type" certain specified information regarding
the buyer's right to cancel the transaction. General Stat-
utes § 42-135a (2). A "home solicitation sale" is defined

_____

[17] General Statutes § 42-134a (a) provides in relevant part that " '[h]ome
solicitation sale' means a sale, lease, or rental of consumer goods or services,
whether under single or multiple contracts, in which the seller or his repre-
sentative personally solicits the sale, including those in response to or
following an invitation by the buyer, and the buyer's agreement or offer to
purchase is made at a place other than the place of business of the seller.
The term 'home solicitation sale' does not include a transaction . . . (5)
pertaining to the sale or rental of real property, to the sale of insurance, to
the sale of newspapers or to the sale of securities or commodities by a
broker-dealer registered with the securities and exchange commission
. . . ."

Meribear Productions, Inc. *v.* Frank

in relevant part as "a sale, lease, or rental of consumer goods or services, whether under single or multiple contracts, in which the seller or his representative personally solicits the sale, including those in response to or following an invitation by the buyer, and the buyer's agreement or offer to purchase is made at a place other than the place of business of the seller. . . ." General Statutes § 42-134a (a). "The term 'home solicitation sale' does not include" various types of transactions, only one of which is pertinent to the present appeal, namely, transactions "*pertaining to the sale or rental of real property*, to the sale of insurance, to the sale of newspapers or to the sale of securities or commodities by a broker-dealer registered with the securities and exchange commission . . . ." (Emphasis added.) General Statutes § 42-134a (a) (5).

The parties dispute whether their contractual agreement for the design, staging, and leasing of home goods and services "pertain[ed] to the sale or rental of real property" under § 42-134a (a) (5). The defendants contend that this exception to the definition of a "home solicitation sale" should be construed narrowly to apply only to contracts for the sale or rental of real property, rather than to goods or services used to facilitate the sale or rental of real property. The plaintiff responds that the defendants' proposed construction of the statute ignores the expansive prefatory phrase "pertaining to," which, the plaintiff points out, Black's Law Dictionary defines as " '[t]o relate to; to concern.' " See Black's Law Dictionary (9th Ed. 2009) p. 1260 (defining "pertain"). The plaintiff argues that the agreement plainly "pertain[ed] to the sale . . . of real property" within the meaning of § 42-134a (a) (5) because the contractual language "clearly and repeatedly states that the sole, whole and entire purpose of the contract was to facilitate the sale of the property."

We begin our analysis with the dictionary definition of the phrase "pertaining to." See, e.g., *Maturo* v. *State Employees Retirement Commission*, 326 Conn. 160, 176, 162 A.3d 706 (2017) ("[w]hen a term is not defined in a statute, we begin with the assumption that the legislature intended the word to carry its ordinary meaning, as evidenced in dictionaries in print at the time the statute was enacted"). The word "pertain" means "[t]o have reference; relate" or "[t]o belong as an adjunct or accessory . . . ." American Heritage Dictionary of the English Language (New College Ed. 1979) p. 979; see also Webster's Third New International Dictionary (1976) p. 1688 (defining "pertain" as "to belong to something as a part or member or accessory or product"). Thus, a transaction is one "pertaining to" the sale or rental of real property if the transaction refers or relates to the sale or rental, or if the transaction is an adjunct or accessory to the sale or rental. Under the former definition, any transaction for goods or services that is associated with or connected to the sale or rental of real property is exempted from the HSSA, whereas, under the latter definition, any transaction for goods or services that facilitates or aids the convenience or effectiveness of the sale or rental would be exempt. See American Heritage Dictionary of the English Language, supra, p. 1097 (defining "relate" as "[t]o bring into logical or natural association" and "[t]o have connection, relation, or reference"); Webster's Third New International Dictionary, supra, p. 11 (defining "accessory" as "an object or device that is not essential in itself but that adds to the beauty, convenience, or effectiveness of something else").

The defendants contend that it would yield absurd and unworkable results to construe the real property exception to apply to all transactions for goods and services that relate to, or are an adjunct or accessory to, the sale or rental of real property and urge us to

Meribear Productions, Inc. *v.* Frank

adopt a limiting principle to ensure that the exception does not operate beyond its intended scope.[18] By way of example, the defendants point out that homeowners who purchase new windows from a door-to-door seller with the subjective purpose of making their home more attractive to potential buyers or renters, and thereby aiding or facilitating the sale or rental of the home, would not be afforded the consumer protections of the HSSA, whereas homeowners who purchase the same windows from the same seller for their own benefit (i.e., with no immediate intention of selling or renting the home) would receive the protections of the statutory scheme. The defendants argue that a limiting construction is necessary because such a random result would defeat the remedial purpose of the HSSA, contrary to the intent of the legislature.

The HSSA is a remedial statue that "must be afforded a liberal construction in favor of those whom the legislature intended to benefit." *Rizzo Pool Co.* v. *Del Grosso*, 232 Conn. 666, 678, 657 A.2d 1087 (1995). As a corollary, we have recognized that exceptions to such statues "should be construed narrowly." *Fairchild Heights, Inc.* v. *Dickal*, 305 Conn. 488, 502, 45 A.3d 627 (2012). In construing the scope of the real property exception to the HSSA, we are mindful that we must intrepret the "statute in a manner that will not thwart its intended purpose or lead to absurd results. . . . We must avoid

[18] In the words of Justice Antonin Scalia, applying the phrase " 'relate[s] to' . . . according to its terms [is] a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *California Division of Labor Standards Enforcement* v. *Dillingham Construction, N.A., Inc.*, 519 U.S. 316, 335, 117 S. Ct. 832, 136 L. Ed. 2d 791 (1997) (Scalia, J., concurring). Accordingly, when the application requires as a practical matter that some limitation be used to cabin such an unbounded phrase, the underlying doctrinal purpose or legislative intention will set those boundaries. See *Ford Motor Co.* v. *Montana Eighth Judicial District Court*, U.S. , 141 S. Ct. 1017, 1033, 209 L. Ed. 2d 225 (2021) (Alito, J., concurring in the judgment) ("[t]o rein in th[e] phrase ['relate to'], limits must be found").

a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve.'' (Internal quotation marks omitted.) *Tayco Corp.* v. *Planning & Zoning Commission*, 294 Conn. 673, 686, 986 A.2d 290 (2010). We agree with the defendants that it would defeat the remedial purpose of the HSSA if the consumer protections it provided were dependent on the subjective purpose for which a homeowner purchases consumer goods and services. See *Desrosiers* v. *Diageo North America, Inc.*, 314 Conn. 773, 785, 105 A.3d 103 (2014) (examining legislative history, even though language of statute was ''plain and unambiguous,'' because ''a literal application of the statutory language would lead to a bizarre result''); *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 803, 955 A.2d 15 (2008) (''[i]n construing a statute, common sense must be used and courts must assume that a reasonable and rational result was intended'' (internal quotation marks omitted)). We therefore turn to extratextual sources of legislative intent to aid our interpretation. See *Tuxis Ohr's Fuel, Inc.* v. *Administrator, Unemployment Compensation Act*, 309 Conn. 412, 422, 72 A.3d 13 (2013) (''[w]hen a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter'' (internal quotation marks omitted)).

The real property exception to the definition of a ''home solicitation sale'' was added to the HSSA in 1976 ''[i]n order to conform to'' the regulations promulgated by the Federal Trade Commission (FTC). 19 S. Proc., Pt. 3, 1976 Sess., p. 1241, remarks of Senator Louis Ciccarello; see Public Acts 1976, No. 76-165, § 1; see also Federal Trade Commission, Cooling Off Period for

Meribear Productions, Inc. *v.* Frank

Door-to-Door Sales, 35 Fed. Reg. 15,164 (September 29, 1970). The FTC rule, which was codified in 1974 at 16 C.F.R. § 429.0 et seq., was enacted to protect consumers from the deceptive sales practices and high-pressure tactics used by some door-to-door sellers of consumer goods and services. See Federal Trade Commission, Cooling-Off Period for Door-to-Door Sales, 37 Fed. Reg. 22,934, 22,937 (October 26, 1972). Under the FTC rule, like the HSSA, door-to-door sellers are required to furnish buyers, in a specified format, notice and explanation of their right to cancel the transaction within three business days. See 16 C.F.R. § 429.1 (b) (2020). The three day "cooling-off period" provides "the consumer with an opportunity to discuss his purchase with others, to reflect upon the provisions of the contract, and perhaps to do a little comparative shopping. This will give him some opportunity to discover misrepresentations made by the salesman, or to realize either that he is paying too high a price for the product or that he simply didn't know when he agreed to buy what he was being asked to pay." Federal Trade Commission, supra, 37 Fed. Reg. 22,942.

Similar to the HSSA, the FTC rule defines a "door-to-door sale" in relevant part as "[a] sale, lease, or rental of consumer goods or services in which the seller or his representative personally solicits the sale, including those in response to or following an invitation by the buyer, and the buyer's agreement or offer to purchase is made at a place other than the place of business of the seller (e.g., sales at the buyer's residence or at facilities rented on a temporary or short-term basis, such as hotel or motel rooms, convention centers, fairgrounds and restaurants, or sales at the buyer's workplace or in dormitory lounges), and which has a purchase price of $25 or more if the sale is made at the buyer's residence or a purchase price of $130 or more if the sale is made at locations other than the

Meribear Productions, Inc. *v.* Frank

buyer's residence, whether under single or multiple contracts. . . .'' 16 C.F.R. § 429.0 (a) (2020). ''The term door-to-door sale does not include a transaction . . . [*p*]*ertaining to the sale or rental of real property*, to the sale of insurance, or to the sale of securities or commodities by a broker-dealer registered with the Securities and Exchange Commission.'' (Emphasis altered.) 16 C.F.R. § 429.0 (a) (6) (2020). The real property exception added to the HSSA in 1976, in other words, uses the exact words contained in the real property exception contained in the FTC rule promulgated in 1974.

The real property exception was adopted by the FTC to alleviate concerns expressed by the National Association of Real Estate Boards. See Federal Trade Commission, supra, 37 Fed. Reg. 22,948 and n.132. The FTC explained that, ''[i]nsofar as the sale of real estate itself is concerned, neither the [FTC] nor members of the real estate sales industry believe that such sales would be subject to the rule as land would not fall within the scope of the definition of consumer goods or services. However, transactions in which a consumer engaged a real estate broker to sell his home or to rent and manage his residence during a temporary period of absence may fall within the class of transactions to which the rule would apply.'' Id., 22,948. In light of this concern, the FTC explicitly excluded transactions ''pertaining to the sale or rental of real property'' from the definition of a ''door-to-door sale . . . .'' (Internal quotation marks omitted.) Id., 22,948–49. In doing so, the FTC ''emphasized that it is not intended to apply to the sale of goods or services such as siding, home improvements, and driveway and roof repairs.'' Id., 22,949.

It is clear that the real property exception to the FTC rule and analogous state statutes adopted in conformity therewith do not encompass routine transactions for home improvement goods and services, regardless of

Meribear Productions, Inc. *v.* Frank

the purpose for which these goods and services are purchased.[19] See, e.g., *Crystal* v. *West & Callahan, Inc.*, 328 Md. 318, 333, 614 A.2d 560 (1992) (holding that "home improvement transactions are not excluded from the Maryland Door-to-Door Sales Act" because "the General Assembly necessarily intended the exemption for real estate to be construed in the same manner as the comparable federal language is construed"). It is less clear, however, whether the real property exception excludes from the scope of the statute the purchase of goods and services that are inextricably related to, or an integral adjunct or accessory to, the sale or rental of real property, such as the engagement of a real estate broker. Stated another way, the FTC commentary fails to explain whether the real property exception was intended simply to codify the understanding that real property transactions are not goods and services under the rule, or whether it was intended to go farther and also exclude from the scope of the rule transactions for some goods and services that pertain to the sale or rental of real property.

There is a dearth of case law and scholarly commentary to aid us in answering this question, but what little authority exists indicates that the real property exception is not limited to transactions for the sale or rental

_____

[19] We note that, under the Home Improvement Act (HIA), General Statutes § 20-418 et seq., home improvement contracts "shall be considered a home solicitation sale pursuant to chapter 740 and shall be subject to the requirements of said chapter regardless of the location of the transaction or of the signing of the contract." General Statutes § 20-429 (e). Thus, home improvement contractors must provide purchasers with notice of their cancellation rights. See generally *Wright Bros. Builders*, *Inc.* v. *Dowling*, 247 Conn. 218, 231, 720 A.2d 235 (1998) ("The HIA is a remedial statute that was enacted for the purpose of providing the public with a form of consumer protection against unscrupulous home improvement contractors. . . .The aim of the statute is to promote understanding on the part of consumers with respect to the terms of home improvement contracts and their right to cancel such contracts so as to allow them to make informed decisions when purchasing home improvement services." (Citation omitted.)).

Meribear Productions, Inc. *v.* Frank

of real estate per se but, instead, encompasses a *narrow* category of transactions involving goods and services that relate to the sale or rental of real property. See, e.g., *Busch* v. *Model Corp.*, 708 N.W.2d 546, 551 (Minn. App. 2006) (holding "that the [contract for the] construction . . . of a new permanent garage . . . [fell] within the 'sales of real property' exception to the home solicitation sale statute" and that "[the] respondent [therefore] was not required to comply with the home solicitation statute's notification requirements"); *Doyle* v. *Chihoski*, 443 A.2d 1243, 1244 (R.I. 1982) (real property exception to staturory definition of "home-solicitation sale" exempts from Home Solicitation Sales Act "any agreement calling for the payment of a commission to a real estate broker who produces the requisite ready, willing, and able buyer"); *McDaniel* v. *Pettigrew*, 536 S.W.2d 611, 615 (Tex. Civ. App. 1976, writ ref'd n.r.e.) (rejecting claim that contract for sale of unimproved lot and new home construction "was not a realty contract but an agreement for services to be performed" under real property exception because "the parties intended that the house to be built [on] the lot was to become a part of the realty"). See generally D. Pridgen et al., Consumer Credit and the Law (April, 2021) § 14:14 (noting that real property exceptions to state cooling off statutes are "quite specific" but encompass some goods and services). Consistent with these authorities, we are persuaded that the real property exception to the definition of a "home solicitation sale" in § 42-134a (a) (5) is not strictly limited to the sale or rental of real property.[20]

_____

[20] The defendants argue that the real property exception to the HSSA should be construed narrowly consistent with the statute of frauds, which does not apply to listing agreements or broker contracts. See, e.g., *Location Realty, Inc.* v. *Colaccino*, 287 Conn. 706, 722, 949 A.2d 1189 (2008) (broker "listing agreements are governed exclusively by [General Statutes] § 20-325a [and] such contracts do not fall within our statute of frauds" (internal quotation marks omitted)); *Brazo* v. *Real Estate Commission*, 177 Conn. 515, 522, 418 A.2d 883 (1979) ("in this state, a contract employing a broker to sell land is not within the [s]tatute of [f]rauds"). The language and purpose

Meribear Productions, Inc. *v.* Frank

First, a "home solicitation sale" under the HSSA, which is the equivalent of a "door-to-door sale" under the FTC rule, is limited to the "sale, lease, or rental of *consumer goods or services* . . . ." (Emphasis added.) General Statutes § 42-134a (a); accord 16 C.F.R. § 429.0 (a) (2020). Thus, the real property exception, by definition, must apply to "consumer goods or services." See General Statutes § 42-134a (b) (" '[c]onsumer goods or services' means goods or services purchased, leased, or rented primarily for personal, family, or household purposes, including courses of instruction or training regardless of the purpose for which they are taken"); see also 16 C.F.R. § 429.0 (b) (2020) (defining "consumer goods or services" as "[g]oods or services purchased, leased, or rented primarily for personal, family, or household purposes, including courses of instruction or training regardless of the purpose for which they are taken"). If the real property exception was intended simply to codify the prevalent understanding that the sale or rental of real property does not "fall within the scope of the definition of consumer goods or services"; Federal Trade Commission, supra, 37 Fed. Reg. 22,948; then the exemption would have been included in the definition of "consumer goods or services," rather than the definition of a "door-to-door sale" under the FTC rule or a "home solicitation sale" under the HSSA.

of the HSSA is fundamentally different from that of the statute of frauds, however, and the defendants' reliance on our case law construing the statute of frauds is therefore misplaced. Compare General Statutes § 52-550 (a) ("[n]o civil action may be maintained in the following cases unless the agreement . . . is made in writing and signed by the party . . . to be charged . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property"), with General Statutes § 42-134a (a) (5) ("[t]he term 'home solicitation sale' does not include a transaction . . . pertaining to the sale or rental of real property"); see also *Heyman* v. *CBS*, *Inc.*, 178 Conn. 215, 221, 423 A.2d 887 (1979) ("the primary purpose of the statute [of frauds] is to provide reliable evidence of the existence and the terms of the contract").

Second, as we previously explained, the plain language of the real property exception is not limited to transactions for the sale or rental of real property. Instead, the exception extends to transactions "*pertaining to* the sale or rental of real property . . . ." (Emphasis added.) General Statutes § 42-134a (a) (5); see also 16 C.F.R. § 429.0 (a) (2020). It is axiomatic that "[e]ach word used by the legislature should be given effect and, as far as possible, the entire enactment is to be harmonized. . . . Words and and phrases of a statute are to be construed according to the commonly approved usage of the language." (Citations omitted; internal quotation marks omitted.) *Ganim* v. *Roberts*, 204 Conn. 760, 763, 529 A.2d 194 (1987). Construing the language of the statute in conformance with the FTC rule, as the legislature intended, and consistent with the remedial purpose of the HSSA, we conclude that a transaction is one "pertaining to the sale or rental of real property" if it is inextricably related to, or an integral adjunct or accessory to, the sale or rental. Accordingly, the sale, lease, or rental of such consumers goods or services are excluded from the definition of a "home solicitation sale" under § 42-134a (a) (5).[21]

---

[21] In arriving at this conclusion, we recognize that, in 2013, the FTC clarified the scope of the real property exception as applied to mortgage assistance relief services. See Federal Trade Commission, Rule Concerning Cooling-Off Period for Sales Made at Homes or at Certain Other Locations, 78 Fed. Reg. 3855, 3857 (January 17, 2013). The FTC determined that the real property exception did not apply "to services related to real property, such as mortgage modification, mortgage loan brokerage, and foreclosure rescue services" because, "[a]s determined by the [FTC] when it promulgated the [cooling-off] [r]ule, this exclusion, which renders the [r]ule inapplicable to the sale of real estate, does not necessarily reach so far as to exempt service-related transactions in which a consumer engages a real estate broker to sell his or her home or to rent and manage his or her residence during a temporary period of absence. Similarly, the exclusion does not necessarily reach so far as to exempt the . . . mortgage assistance relief services . . . ." (Footnote omitted.) Id., 3857 and n.24, citing Federal Trade Commission, supra, 37 Fed. Reg. 22,948. In the view of the FTC, "the [c]ooling-[o]ff [r]ule's right to cancel should extend to door-to-door sales of [mortgage assistance relief services]" because sellers "direct their claims to financially

Meribear Productions, Inc. *v.* Frank

Having determined that a limited category of consumer goods and services may be excluded from the HSSA under the real property exception, we next consider whether the agreement at issue in the present case was inexctricably related to, or an integral adjunct or accessory to, the sale of the defendants' residence at 3 Cooper Lane. We begin and end our analysis with the language of the agreement, which definitively settles the question. The agreement provides that "[i]t is understood that 3 Cooper Lane . . . is for sale and that Joan E. Frank . . . has entered into this agreement with [the plaintiff] to stage the [p]roperty for the purpose of sell-

distressed consumers who often are desperate for any solution to their mortgage problems and thus are vulnerable to the providers' purported solutions." Federal Trade Commission, supra, 78 Fed. Reg. 3857. These concerns are "exacerbated in situations in which sellers exercise undue influence over susceptible classes of purchasers" in the context of door-to-door sales. Id.

The FTC's 2013 statement does not undermine our conclusion that the real property exception in the HSSA encompasses a limited category of consumer goods or services. The 2013 statement was released more than thirty years after the promulgation of the FTC's cooling-off rule and, therefore, is "a hazardous basis for inferring the intent of [the] earlier" FTC. (Internal quotation marks omitted.) *State* v. *Nixon*, 231 Conn. 545, 560, 651 A.2d 1264 (1995); see also 2A N. Singer & S. Singer, Statutes and Statutory Construction (7th Ed. 2014) § 48:20, p. 641 ("a subsequent legislature may change an act to achieve whatever prospective meaning or effect it desires, but courts generally give little or no weight to the views of members of subsequent legislatures about the meaning of acts passed by previous legislatures"). Even if this postenactment statement could be deemed useful in illuminating the purpose and intent animating the 1974 FTC exception to the cooling-off rule, it was not available to the Connecticut legislature in 1976, when the real property exception to the HSSA was adopted, and, therefore, is not indicative of our own legislature's intent. In addition, we cannot ignore the fact that the 2013 statement relates to special concerns stemming from the fallout of the 2008 financial crisis, which specifically involved the mortgage lending industry. This context plainly informs the FTC's statement expressing the view that certain transactions pertaining to the sale or rental of real property may fall outside the scope of the real property exception if a seller targets vulnerable and desperate consumers who are not in a position to make "informed purchasing decisions . . . ." Federal Trade Commission, supra, 78 Fed. Reg. 3857. The agreement at issue in this case is far removed from such concerns.

ing the [p]roperty.'' The initial term of the lease was for four months or ''until the buyer's contingencies are either satisfied or waived with respect to the purchase of the [p]roperty, whichever comes first. If, after the expiration of the four . . . months, [t]he [p]roperty is not in escrow, the lease shall continue on a month to month basis provided that either party may terminate upon [fifteen] business day prior written notice . . . .'' Joan Frank was required to ''inform [the plaintiff] when the [p]roperty goes into escrow, the date the contingencies are expected to be satisfied, and the date escrow is expected to close. [The plaintiff] may remove the [i]nventory once all of the buyer's contingencies have been met, expired or have been waived,'' or ''[i]f the [p]roperty is not listed on the [multiple listing services] within [sixty] days of the completion of staging . . . .'' Joan Frank was further required to ''notify the prospective buyer of the [p]roperty that the [i]nventory is the subject of th[e] [a]greement and that [the plaintiff] has the absolute right hereunder to remove the [i]nventory from the [p]roperty before the close of escrow. [Joan Frank] shall provide [the plaintiff] with at least [ten] business days prior written notice . . . of the anticipated date of the close of escrow or other sale or transfer of the [p]roperty. . . . [The plaintiff] shall have not less than [three] business days (following the expiration of the time period pursuant to the [n]otice of [c]losing [d]ate or the [n]otice of [t]ermination) within which to complete its removal of all [i]nventory . . . .''

The sale of the defendants' residence was the stated purpose of the agreement, defined the duration of the agreement, and delimited its various terms. Under the agreement, for example, the plaintiff could remove the home furnishings and décor if the defendants' residence was not listed for sale within a prescribed period of time or if, after listing, a buyer had been found and the buyer's contingencies had been met, expired, or waived.

Meribear Productions, Inc. *v.* Frank

Additionally, the initial lease term was delineated by the procurement of a buyer for the residence and automatically continued on a monthly basis, so long as the defendants' residence was not in escrow or the lease was not terminated. Given that the terms of the agreement were intertwined with the sale of the property, we conclude that the agreement was inextricably related to, or an integral adjunct or accessory to, the sale of the defendants' residence and, therefore, excluded from the definition of a "home solicitation sale" pursuant to § 42-134a (a) (5). Accordingly, the trial court correctly determined that the agreement was not subject to the notice of cancellation provisions in the HSSA.

III

Lastly, we address the defendants' claim that the trial court's award of damages was improper. The defendants contend that the trial court awarded the plaintiff "double damages" by rendering judgment against both George Frank and Joan Frank for the same loss and incorrectly calculated the amount of damages for which Joan Frank was liable on the breach of contract count by including the conversion value of the home furnishings and décor. The plaintiff acknowledges that it "may collect only once for the same injury" but argues that the trial court "properly awarded the appropriate amount as to each count representing recovery for each wrong complained of." The plaintiff further argues that the trial court properly included the value of the home furnishings and décor in its award of damages on the breach of contract count because Joan Frank's wrongful conduct resulted "in the total loss of that inventory to the plaintiff."

We begin our analysis with the defendants' double recovery claim. "Plaintiffs are not foreclosed from suing multiple defendants, either jointly or separately, for

injuries for which each is liable, nor are they foreclosed from obtaining multiple judgments against joint [or successive] tortfeasors.'' (Footnote omitted; internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 111–12, 952 A.2d 1 (2008). ''This rule is based on the sound policy that seeks to ensure that parties will recover for their damages.'' *Gionfriddo* v. *Gartenhaus Cafe*, 211 Conn. 67, 71, 557 A.2d 540 (1989). ''The possible rendition of multiple judgments does not, however, defeat the proposition that a litigant may recover just damages only once. . . . Double recovery is foreclosed by the rule that only one satisfaction may be obtained for a loss that is the subject of two or more judgments.'' (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id., 71–72; see *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 29 n.14, 699 A.2d 964 (1997) (''the principle against double recovery for the same loss applies in both tort and contract law''); 2 Restatement (Second), Judgments § 49, comment (b), p. 36 (1982) (''[a] judgment against one obligor under a contract does not terminate the claim against another obligor under the contract''). In general, a loss is satisfied when a judgment of economic damages rendered in favor of the plaintiff in compensation for the loss has been paid in full. See *Gionfriddo* v. *Gartenhaus Cafe*, supra, 69, 75–76 (plaintiff was precluded from suing joint tortfeasor for wrongful death of decedent under double recovery doctrine because ''the plaintiff received compensatory, exemplary and treble damages in the amount of $1,187,763'' for his loss in prior action, which ''the defendants . . . satisfied . . . in full''); see also *Mazziotti* v. *Allstate Ins. Co.*, 240 Conn. 799, 807, 695 A.2d 1010 (1997) (''The satisfaction of a judgment refers to compliance with or fulfillment of the mandate thereof. . . . There is realistically no substantial difference between the words paid and satisfied in the judgment context.'' (Citation omitted; internal quotation marks omitted.)).

Meribear Productions, Inc. *v.* Frank

The trial court's judgment on count one of the complaint against George Frank and count two of the complaint against Joan Frank awarded money damages in different amounts for the same underlying loss. George Frank is personally liable for the damages awarded on count one; Joan Frank is personally liable for the damages awarded on count two.[22] Any payments made by George Frank in satisfaction of the judgment against him reduces the amount owed by Joan Frank, and any payments made by Joan Frank in satisfaction of the judgment against her reduces the amount owed by George Frank. See *Gionfriddo* v. *Gartenhaus Cafe*, supra, 211 Conn. 72 n.5 ('' 'When a judgment has been rendered against one of several persons each of whom is liable for a loss claimed in the action on which the judgment is based . . . [a]ny consideration received by the judgment creditor in payment of the judgment debtor's obligation discharges, to the extent of the amount of value received, the liability to the judgment creditor of all other persons liable for the loss.' Thus, '[a] payment by one person liable for a loss reduces pro tanto the amount that the injured person is entitled to receive from other persons liable for the loss.' ''), quoting 2 Restatement (Second), supra, § 50 and comment (c), pp. 40–42.

It is undisputed that the plaintiff's loss was wholly unsatisfied when the trial court rendered judgment in

[22] The California default judgment compensated the plaintiff for George Frank's breach of the agreement, just as the trial court's judgment on count two compensated the plaintiff for Joan Frank's breach of the agreement. The trial court's award of damages against George Frank on count one, enforcement of the California default judgment, was the same as the amount awarded by the California court: $259,746.10. The trial court's award of damages against Joan Frank on count two, breach of contract, was for $283,106.45. The award of damages against Joan Frank was not calculated on the basis of the California judgment but, instead, was determined by the trial court on the basis of evidence presented at trial regarding the damages sustained by the plaintiff as a result of Joan Frank's breach of the agreement. On appeal, the defendants do not challenge the discrepancy between the damages awarded against George Frank and Joan Frank.

favor of the plaintiff on counts one (enforcement of the California judgment against George Frank) and two (breach of contract against Joan Frank). Although the plaintiff may recover only once for its loss, the trial court was "not foreclosed" from rendering judgment in favor of the plaintiff against both defendants "jointly *or separately*, for injuries for which each is liable . . . to ensure that [the plaintiff] will recover for [its] damages." (Ciations omitted; emphasis added; footnotes omitted.) *Gionfriddo* v. *Gartenhaus Cafe*, supra, 211 Conn. 71. We therefore reject the defendants' double recovery claim.

Lastly, the defendants contend that the amount of damages awarded to the plaintiff on its breach of contract claim against Joan Frank was incorrect because it included the value of the home furnishings and décor installed at 3 Cooper Lane. The following additional facts are relevant to this claim. The agreement provided that, at the conclusion of the lease term for the rental of the home furnishings and décor, the plaintiff "shall have not less than [three] business days . . . within which to complete its removal of all [i]nventory, with [Joan Frank's] permission, which will not be unreasonably withheld." (Emphasis in original.) Furthermore, the agreement required Joan Frank to acquire, prior to installation of the home furnishings and décor, a $200,000 "insurance policy insuring the value of the [i]nventory and a [g]eneral [l]iability policy of insurance, each naming [the plaintiff] as an additional insured." Following installation, the plaintiff was required to provide Joan Frank "with a list of the [i]nventory and values. If [i]nventory is damaged, lost, stolen or destroyed, [Joan Frank] will immediately notify [the plaintiff] in writing, and file all necessary reports, including those required by [the] insurer or by law. . . . [Joan Frank] shall be primarily liable to [the plaintiff] for any loss or liability related to the [i]mprove-

Meribear Productions, Inc. *v.* Frank

ments and shall pay to [the plaintiff] any '[s]tipulated [l]oss [v]alue' or other damages not covered by insurance.''

At trial, the plaintiff admitted into evidence a list of the home furnishings and décor installed at 3 Cooper Lane pursuant to the parties' agreement, as well as documentation of their value and photographs depicting their quality and appearance after installation. On the basis of this evidence, the trial court found that the home furnishings and décor were "appropriate" for the defendants' "luxury home in an affluent community . . . ." The trial court also found "credible the plaintiff's uncontested evidence [namely] the schedule of values of the inventory based on standard industry pricing for used furniture of the quality provided to the defendants. The plaintiff has lost the use of the inventory, and, moreover, the defendants have been wrongfully using the furniture in their personal residence for approximately three years. The inventory was . . . supposed to be there [only] for a period of months. Consequently, the plaintiff had to replace the inventory. The essence of the staging agreement was to give the defendants' residence a showroom quality appearance, and, as noted, the inventory is reflective of that quality. Therefore, the court awards damages related to the inventory loss for the plaintiff and against Joan Frank on the first count in the amount of $235,598. Additionally, the evidence establishes that Joan Frank is responsible to the plaintiff for the rental loss and related late fees in the amount of $47,508.45. In view of the foregoing, the court awards damages on the second count for the plaintiff and against . . . Joan Frank . . . in the amount of $283,106.45.''

It is well established that "[t]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous." (Cita-

tions omitted; internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 68, 717 A.2d 724 (1998). "In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A factual finding may be rejected by this court only if it is clearly erroneous. . . . A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . We are, therefore, constrained to accord substantial deference to the fact finder on the issue of damages. In deciding whether damages properly have been awarded, however, we are guided by the well established principle that such damages must be proved with reasonable certainty." (Citation omitted; internal quotation marks omitted.) Id., 68–69.

"The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed. . . . It has traditionally been held that a party may recover general contract damages for any loss that may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself." (Internal quotation marks omitted.) *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 32, 662 A.2d 89 (1995). Thus, in a breach of contract action, the plaintiff's damages are limited to those that "the defendant had reason to foresee as the probable result of the breach at the time when the contract was made." *Neiditz* v. *Morton S. Fine & Associates, Inc.*, 199 Conn. 683, 689 n.3, 508 A.2d 438 (1986); see also 3

Meribear Productions, Inc. *v.* Frank

Restatement (Second), Contracts § 351 (1) and (2), p. 135 (1981) ("Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made. . . . Loss may be foreseeable as a probable result of a breach because it follows from the breach . . . in the ordinary course of events . . . ."). "[T]he question whether a particular element of loss was reasonably foreseeable is a question of fact . . . ." (Internal quotation marks omitted.) *Ambrogio* v. *Beaver Road Associates*, 267 Conn. 148, 162, 836 A.2d 1183 (2003).

We conclude that the trial court's award of damages for the plaintiff's loss of the home furnishings and décor was not clearly erroneous.[23] The agreement required Joan Frank to permit the plaintiff to remove the home furnishings and décor at the conclusion of the lease term, to insure them for $200,000, and to pay the plaintiff "damages not covered by insurance" if they were "damaged, lost, stolen or destroyed . . . ." The trial court found that Joan Frank breached the agreement and "wrongfully us[ed] the furniture in [the defendants'] personal residence for approximately three years," thus causing the plaintiff's total loss of the inventory valued at $235,598. In light of these facts, which the defendants do not challenge on appeal, we perceive no error in the trial court's finding that the plaintiff's loss of the home furnishings and décor was a reasonably foreseeable consequence of Joan Frank's breach of the agreement. We therefore uphold the trial court's award of damages in favor of the plaintiff.

The judgment is affirmed.

In this opinion ROBINSON, C. J., and McDONALD and KAHN, Js., concurred.

[23] Joan Frank does not challenge the trial court's award of $47,508.45 for the lost rental value of the home furnishings and décor and related late fees; nor does she claim that the award of damages for both rental loss and inventory loss for the home furnishings was improper.

D'AURIA, J., with whom MULLINS, J., joins, concurring in part and dissenting in part. I agree with parts II and III of the majority opinion, specifically, the court's determinations that the contract at issue was not a "home solicitation sale" within the meaning of General Statutes § 42-134a (a) (5) and that the trial court's award of damages was proper. I respectfully dissent, however, from part I of the majority opinion, which holds that the state court in California had personal jurisdiction over the defendant George A. Frank on the basis of the application of California law and, specifically, the "closely related" doctrine. I do not believe it is prudent for us to consider and decide the issue of personal jurisdiction on the basis of a theory that the plaintiff did not advance, either in the trial court or before this court. If the court is unable to uphold the trial court's determination of personal jurisdiction over George Frank in California on the basis of the factual record developed and the legal theory the plaintiff has argued, I would end the inquiry and reverse the trial court's judgment as to George Frank on count one of the plaintiff's complaint.

I agree completely that the full faith and credit clause of the United States constitution governs an action to enforce a foreign judgment in this state and requires that we "accord to the judgment of another state the same credit, validity and effect as the state that rendered the judgment would give it. . . . This rule [is tempered by] the proposition that lack of jurisdiction [in that foreign court] renders a foreign judgment void." (Citation omitted.) *Packer Plastics, Inc.* v. *Laundon*, 214 Conn. 52, 56, 570 A.2d 687 (1990). I also agree that "[t]he party raising a jurisdictional claim as a defense against the enforcement of a foreign judgment bears the burden of proving, by a preponderance of the evidence, facts that demonstrate that the foreign court lacked jurisdic-

Meribear Productions, Inc. *v.* Frank

tion." (Internal quotation marks omitted.) Part I of the majority opinion, quoting *Maltas* v. *Maltas*, 298 Conn. 354, 364 n.11, 2 A.3d 902 (2010). However, I am unaware of authority holding that our full faith and credit obligation requires that we research and vindicate arguments that the plaintiff has not made in support of the foreign judgment.

The trial court in this case found that George Frank had failed to carry his burden of demonstrating that the California court lacked jurisdiction, rejecting his argument that he did not consent to jurisdiction in California because he was not a party to the "Staging Services and Lease Agreement" (agreement) and, therefore, that the forum selection clause in the agreement "cannot form a proper basis for jurisdiction." Rather, the trial court found, on the basis of the factual record, that George Frank had been properly served in Connecticut and had "signed a guarantee of the staging agreement with a company [the plaintiff] that has a principal place of business in California and that provides that Los Angeles is the appropriate forum." The trial court therefore determined that the court in California had personal jurisdiction over George Frank on the basis of proper service of process and constitutionally sufficient minimum contacts. George Frank originally appealed from the trial court's judgment nearly seven years ago.

This case has now been before this court twice and before the Appellate Court once. In both courts, and in all three appeals, the parties have briefed and argued the issue of whether the court in California had personal jurisdiction over George Frank in rendering a default judgment against him on the terms that the trial court addressed. See *Meribear Productions, Inc.* v. *Frank*, 328 Conn. 709, 714–15, 183 A.3d 1164 (2018); *Meribear Productions, Inc.* v. *Frank*, 165 Conn. App. 305, 311–15, 140 A.3d 993 (2016). Specifically, George Frank has

Meribear Productions, Inc. *v.* Frank

consistently argued that he lacked sufficient minimum contacts with California and that the assertion of personal jurisdiction over him in that state offended traditional notions of fair play and substantial justice, in violation of the due process clause of the fourteenth amendment to the United States constitution. See *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 478, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985) ("an individual's contract with an out-of-state party *alone* [cannot] automatically establish sufficient minimum contacts in the other party's home forum" (emphasis in original)). The plaintiff has not raised any alternative ground to affirm the trial court's judgment against George Frank. See Practice Book § 63-4 (a) (1) (A).

The majority declines to address the jurisdictional question that both the trial court and the Appellate Court decided, that George Frank and his wife, the named defendant, Joan E. Frank, have challenged and briefed on appeal, and that the plaintiff has responded to in kind. Rather, the majority states: "We need not address the defendants' minimum contacts argument because we conclude that George Frank consented to personal jurisdiction in California."

In support of this conclusion, the majority has discovered a different legal theory, which is based on California law, that, when applied to the factual record here, the majority holds resulted in personal jurisdiction over George Frank on the basis of consent, regardless of whether he signed the agreement containing the forum selection clause. Specifically, the majority applies California's "closely related" doctrine, an exception to the general rule that a nonsignatory to a contract is not bound by a forum selection clause contained in that contract. See *Berclain America Latina, S.A. de C.V.* v. *Baan Co. N.V.*, 74 Cal. App. 4th 401, 405, 87 Cal. Rptr. 2d 745 (1999). Under the closely related doctrine, a forum selection clause may be enforced against a non-

Meribear Productions, Inc. *v.* Frank

signatory who is "so closely involved in the agreement or associated with a party to the transaction as to be functionally equivalent to that party." Id., 403; see also *Net2Phone, Inc.* v. *Superior Court*, 109 Cal. App. 4th 583, 588, 135 Cal. Rptr. 2d 149 (2003), review denied, California Supreme Court, Docket No. S117411 (August 27, 2003). Applying California law, the majority concludes that George Frank was so "closely related" to the agreement that he is bound by its forum selection clause and, on the basis of this theory, concludes that he therefore consented to personal jurisdiction in California. In support of this conclusion, the majority cites to the following facts: George Frank participated in the negotiation of the agreement; he made substantive changes to the agreement; he executed Addendum B, a credit card authorization for payment of the staging services; he was married to the agreement's signatory, Joan Frank; and he personally benefited from the agreement.

Although the majority has "no trouble concluding that [George Frank] received a direct benefit under the agreement," that is a finding that the trial court did not make. Indeed, because the home at issue was only in Joan Frank's name and George Frank was not a signatory to the agreement, any benefit George Frank derived from using the furniture while he lived in the house with her might be more aptly described as indirect. Further, much of this indirect benefit stems from the breach of the agreement, not the agreement itself. Nor do I have the same confidence as the majority does that, without the input of the parties, I know with any certainty whether the closely related doctrine, which has not been litigated in Connecticut, properly applies to this case.[1] In particular, I note that, in each of the

---

[1] Nor do I consider this case a good candidate for seeking supplemental briefing from the parties because the plaintiff has not sought to inject this theory into the case. See, e.g., *State* v. *Armadore*, 338 Conn. 407, 419–20, 258 A.3d 601 (2021) (appellate courts have discretion to order supplemental briefing).

Meribear Productions, Inc. *v.* Frank

California cases cited by the majority, it was the defendant who sought the protection of the forum selection clause. See *Net2Phone, Inc.* v. *Superior Court*, supra, 109 Cal. App. 4th 587; *Bancomer, S. A.* v. *Superior Court*, 44 Cal. App. 4th 1450, 1461, 52 Cal. Rptr. 2d 435 (1996); *Lu* v. *Dryclean-U.S.A. of California, Inc.*, 11 Cal. App. 4th 1490, 1493–94, 14 Cal. Rptr. 2d 906 (1992). Because the courts of California have not weighed in on whether the closely related doctrine applies under these facts, I hesitate to presume that it does.

But, even if I had confidence in the factual record or in my own ability to determine and apply California law, I would be disinclined to decide this civil case, between two well represented parties, in the way the majority does. Although the majority is correct that, "[i]n resolving a claim raised by the parties, we are not required to constrain our analysis to the law relied on by the parties"; *In re David B.*, 167 Conn. App. 428, 448 n.10, 142 A.3d 1277 (2016); I believe the court's resolution of this personal jurisdiction issue taxes the limits of that latitude, although I would hasten to add that reasonable minds can differ on this point. More particularly, in addition to my concern that we might be going beyond the confines of our adversarial system in our discovery of an additional doctrine that supports the plaintiff, I am at least equally concerned about cases in which we do *not* summon a similar ingenuity to bring a different approach to an issue that might arguably be related to that which is under consideration. How will we know when to do so and when not to?

To be sure, this is not an easy line to draw, and appellate courts struggle mightily to do so with any consistency. As the majority indicates, distinguishing between "claims or issues" that the parties themselves have not raised, on the one hand, and "arguments or factors" pertaining to claims or issues they *have* raised, on the other, can be challenging. See, e.g., *Jobe* v. *Com-*

*missioner of Correction*, 334 Conn. 636, 644 n.2, 224 A.3d 147 (2020); *State* v. *Santiago*, 318 Conn. 1, 124, 122 A.3d 1 (2015). Nor is it easy to determine whether a legal argument is "subsumed within or intertwined with arguments related to the legal claim" before the court. (Internal quotation marks omitted.) *Jobe* v. *Commissioner of Correction*, supra, 644 n.2. The court's foray into California law not cited or argued by the parties is too far for me in the present case, however, and I would not reach the ground for upholding personal jurisdiction over George Frank that the majority reaches.

In my view, the majority's determination not to affirm on the ground on which the trial court decided the case must mean the majority has grave doubts that it can affirm on that ground. This to say that, if the court believed it could affirm on the more straightforward and conventional minimum contacts analysis that the trial court found and the parties briefed, I doubt seriously it would venture into California law. So, although George Frank, in the majority's view, was so "closely related" to the agreement with the forum clause that he is deemed to have consented to jurisdiction in California, this close relationship to a contract with the California plaintiff apparently falls short of establishing minimum contacts, either by itself or in combination with any other facts of record. For the purposes of my opinion, I accept this implied determination that personal jurisdiction over George Frank cannot constitutionally be sustained and would stop there.

I therefore respectfully dissent as to the determination of personal jurisdiction over George Frank.